Francis H. TUNG, Plaintiff–Appellant,

v.

TEXACO INCORPORATED,
Defendant–Appellee.

Docket 97–9262.

United States Court of Appeals,
Second Circuit.

Argued June 24, 1998.

Decided July 22, 1998.

Francis H. Tung, Wilton, Connecticut, Plaintiff–Appellant, submitted a brief pro se.

Gary G. Cooper, Elmsford, New York (Robert Yarbrough, Cooper, Leibowitz, Royster & Wright, Elmsford, New York, on the brief), argued for Defendant–Appellee.

Before: VAN GRAAFEILAND, KEARSE, and JACOBS, Circuit Judges.

PER CURIAM:

Plaintiff *pro se* Francis H. Tung appeals from a final judgment of the United States District Court for the Southern District of New York, Charles L. Brieant, *Judge,* dismissing his complaint alleging that defendant Texaco Incorporated ("Texaco"), in implementing a reduction in force, violated his rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (1994), and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* (1994). The district court granted summary judgment on the ground that Tung had signed a release of his rights to sue under the federal employment discrimination statutes. On appeal, Tung contends principally that the release (a) was not voluntary in light of the totality of the circumstances, and (b) is unenforceable because it did not comply with the requirements of the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f)

(1994). For the reasons that follow, we affirm the dismissal of Tung's Title VII claims and vacate the dismissal of his ADEA claim.

## I. BACKGROUND

From 1980 until 1995, Tung was employed as an operations research analyst in the Information Technology Department of Texaco's Harrison, New York headquarters. Tung, a naturalized United States citizen of Chinese ancestry, has a bachelor of science degree in chemistry from Taiwan University, a master's degree in computer science from City College of New York, and a master's degree in operations research from Columbia University. At the time of his discharge, he was 56 years of age.

On February 28, 1995, Judith R. Mandile, Manager of Information Systems in Texaco's Information Technology Department, advised Tung that he was being terminated as part of a company-wide reduction in force. Mandile told Tung that he was selected for termination because of his lower performance rating in relation to others in the department, and that his employment with Texaco would end in April. During the February 28 meeting, Mandile gave Tung a packet of documents relating to his separation from Texaco, including one entitled "The Separation Pay Plan of Texaco Inc.: Election of Benefits and Enhanced Benefits Release for Non–California Employees" (the "Release").

Under the terms of the Release, the employee to be terminated could elect to receive either "Basic benefits" totaling one week's pay for each year of continuous service with Texaco, up to a maximum of 10 weeks' pay, or "Enhanced benefits" totaling two weeks' pay for each year of continuous service, up to a maximum of 52 weeks' pay. In order to receive the enhanced benefits, the employee was required to agree to "voluntarily release and forever discharge" Texaco from any and all claims arising in connection with his employment or separation from employment "includ[ing] ... claims arising under federal, state or local labor or employment discrimination laws, such as the Age Discrimination in Employment Act."

Tung signed the Release on April 28, 1995. On that day, he was given a list of the job titles and ages of the employees in his department who had been separated from Texaco under its Separation Pay Plan since the beginning of the year, and the ages of the department employees not separated. Between May and November of 1995, Texaco paid Tung $46,497 representing two weeks' pay for each of his 14 years of employment.

Thereafter, Tung filed a charge of discrimination with the Equal Employment Opportunity Commission, and after receiving a right-to-sue letter, he commenced the present action. Tung's complaint alleged that Texaco had discriminated against him on the basis of race and national origin in violation of Title VII, and on the basis of age in violation of the ADEA, by maintaining a hostile work environment, having a subjective evaluation process, and selecting him for termination.

Texaco moved to dismiss the complaint for failure to state a claim on which relief can be granted, or, in the alternative, for summary judgment, arguing that, by executing the Release, Tung had knowingly and voluntarily waived all claims against Texaco. In opposition to the motion, Tung contended that his waiver of statutory claims had not been voluntary. He stated:

I signed the release, which I played absolutely no role in drafting or negotiating, and selected "Option B" [, the enhanced benefits,] because, at the time, I was actively seeking reemployment ... with Texaco. Had I refused this option, I would have tipped the company to the possibility that I might sue it, prejudicing entirely my chance for re-employment. I also signed the general release and chose "Option B" because I very much feared the economic impact of my termination. .... For these reasons, my consent was not truly voluntary.

(Affidavit of Francis H. Tung dated July 22, 1997 ("Tung Aff.") ¶ 3.) Tung also argued that Texaco had not complied with the requirements of the OWBPA in obtaining the Release.

In a Memorandum and Order dated September 11, 1997 ("Opinion") the district court granted Texaco's motion for summary judgment. In determining whether Tung's waiver was knowing and voluntary, the court applied the "totality of the circumstances" test of *Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 402–03 (2d Cir.), *cert. denied*, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989), and looked to such factors as

(1) the Plaintiff's education and business experience; (2) the amount of time Plaintiff had possession of or access to the agreement before signing it; (3) the role of the Plaintiff in deciding the terms of the agreement; (4) the clarity of the agreement; (5) whether the Plaintiff was represented by or consulted with an attorney; and (6) whether the consideration given, in exchange for the waiver of claims, exceeds employee benefits to which the employee was already entitled by law.

Opinion at 5. The district court concluded that Tung's waiver of his claims was knowing and voluntary. Moreover, the district court found that because Tung failed to return or unconditionally offer to return the consideration he had received for executing the Release, he was "deemed to have ratified the Release and is thereby barred from challenging its validity." Opinion at 7. Judgment was entered dismissing the complaint, and this appeal followed.

## II. DISCUSSION

On appeal, Tung contends principally that although he signed the Release, (a) it was not, in the circumstances, a voluntary waiver of his rights, and (b) the Release failed to comply with the requirements of the OWBPA. As to Tung's Title VII claims, we affirm the dismissal substantially for the reasons stated in the district court's Opinion. We agree that, under the totality-of-the-circumstances analysis, Tung's waiver of his right to sue under Title VII was knowing and voluntary.

However, a purported waiver of ADEA claims is also governed by the Older Workers Benefits Protection Act, 29 U.S.C. § 626(f). The OWBPA provides that "[a]n individual may not waive any right or claim under [the ADEA] unless the waiver is know-

ing and voluntary," and that "a waiver may not be considered knowing and voluntary unless at a minimum" it conforms to certain specific statutory requirements. 29 U.S.C. § 626(f)(1). Thus, an employee may not waive an ADEA claim unless the employer complies with the specific duties imposed upon it by the statute. *See Oubre v. Entergy Operations, Inc.,* —— U.S. ——, ——, 118 S.Ct. 838, 841, 139 L.Ed.2d 849 (1998). For example, an employer requesting a waiver in connection with a termination program offered to a group of employees must give the employee a period of at least 45 days in which to consider the waiver agreement, *see* 29 U.S.C. § 626(f)(1)(F)(ii), and must inform the employee of certain facts about the group of individuals eligible or selected for the program, including their ages, *see id.* § 626(f)(1)(H). The required information must be given to the employee "at the commencement of the period" which the employee is given to consider the waiver. *Id.*

In the present case, Texaco failed to comply with the requirement that the specified information as to the ages of other employees involved in the same termination program be given to Tung "at the commencement of the period" of time he was given to consider the agreement. Texaco admits that the required information was given to Tung on April 28, 1995, the very date on which Tung signed the Release. Accordingly, under the terms of the OWBPA, Tung's waiver of his ADEA claim cannot be considered knowing and voluntary. Although Tung was given more than the minimum 45 days to consider signing the Release, this does not affect the analysis in this case where the required information was not given until the day the waiver agreement was executed.

■ Texaco contends, and the district court agreed, that regardless of whether the waiver was knowing and voluntary, Tung ratified it by not tendering to Texaco, prior to suit, the return of the consideration he received (*i.e.,* the excess of "Enhanced benefits" over "Basic benefits") for executing the Release. However, in *Oubre v. Entergy Operations, Inc.,* —— U.S. ——, 118 S.Ct. 838, 139 L.Ed.2d 849, decided after the district court's ruling in the present case, the Su-

preme Court directly rejected such a contention, holding that a release that "does not conform to the statute" "cannot bar [an] ADEA claim," and that the "employer cannot invoke the employee's failure to tender back as a way of excusing its own failure to comply" with the OWBPA. *Id.* 118 S.Ct. at 842. Accordingly, Tung's ADEA claim could not properly be dismissed on account of his failure to tender return of the enhanced benefits.

Although an employer such as Texaco, which has paid consideration for a waiver invalidated by the OWBPA and is then sued, cannot bar the ADEA claim, it may have "claims for restitution, recoupment, or setoff against the employee." *Id.* We note that "these questions may be complex where[, as here,] a release is effective as to some claims but not as to ADEA claims." *Id.* We leave consideration of these questions to the district court in the first instance.

■ Texaco also contends that Tung is equitably estopped from challenging the validity of the Release because he committed fraud in the inducement of the agreement. It asserts that Tung conceded such fraud by admitting that he signed the Release with an undisclosed intention to sue Texaco. However, what Texaco characterizes as such a concession is Tung's affidavit statement that he signed the Release, in part, because not doing so "would have tipped the company to the *possibility* that I *might* sue it, prejudicing entirely my chance for re-employment." (Tung Aff. ¶ 3 (emphasis added).) Though this statement is subject to various interpretations, it can reasonably be read as indicating not that Tung had decided to sue but rather that he was concerned that Texaco would infer the possibility of suit if he failed to sign the Release and that such a suspicion would prejudice his chances for reemployment at Texaco.

## CONCLUSIONS

We have considered all of the contentions advanced by the parties on this appeal, and, except to the extent indicated above, have found them to be without merit. The judgment of the district court is affirmed insofar

as it dismissed Tung's Title VII claims and is vacated insofar as it dismissed his ADEA claim. The matter is remanded for further proceedings on the ADEA claim.